Slip Op. 08-22

UNITED STATES COURT OF INTERNATIONAL TRADE

_____
                                        :
NAVNEET PUBLICATIONS (INDIA)            :
LIMITED,                                :
                                        :
              Plaintiff,                :
                                        :
       v.                               :    Before: Richard K. Eaton,
                                        :           Judge
UNITED STATES,                          :
                                        :    Court No. 06-00401
              Defendant,                :
       and                              :    Public Version
                                        :
ASSOC. OF AMERICAN SCHOOL PAPER         :
SUPPLIERS,                              :
                                        :
           Defendant-Intervenor.        :
_____:


OPINION

[United States International Trade Commission's Final
Determination sustained.]


                               Dated: February 26, 2008


*deKieffer & Horgan* (*Gregory S. Menegaz* and *John J. Kenkel*), for
plaintiff Navneet Publications (India) Limited.

*James M. Lyons,* General Counsel, United States International
Trade Commission; *Andrea C. Casson,* Assistant General Counsel for
Litigation, United States International Trade Commission (*Peter
L. Sultan*), for defendant.

*Wiley Rein LLP* (*Alan H. Price, Timothy C. Brightbill,* and *Maureen
E. Thorson*), for defendant-intervenor Association of American
School Paper Suppliers.

Eaton, Judge: Before the court is the motion for judgment upon the agency record of plaintiff Navneet Publications (India) Limited ("Navneet"). *See* Pl.'s R. 56.2 Mem. Supp. Mot. J. Agency R. ("Pl.'s Mem."). Defendant the United States International Trade Commission ("ITC" or the "Commission") and defendant-intervenor the Association of American School Paper Suppliers (the "Association") oppose Navneet's motion. *See* ITC's Opp'n Pl.'s Mot. J. Agency R. ("ITC's Opp'n"); Association's Revised Resp. Br. ("Ass'n.'s Resp.").

By its motion, Navneet challenges the ITC's final determination that imports into the United States of certain lined paper school supplies ("CLPSS") from India are causing or threaten to cause material injury to the United States CLPSS industry. *See* CLPSS from China, India, and Indonesia, 71 Fed. Reg. 55,804 (ITC Sept. 25, 2006) (notice of final determination); CLPSS from China, India, and Indonesia (Final), USITC Pub. 3884, Inv. Nos. 701-TA-442-443 and 731-TA-1095-1097 (Sept. 2006) ("Final Determination") (final determination of material injury to an industry by reason of imports of CLPSS from India and Indonesia that were subsidized and of material injury or threat of material injury by reason of imports of CLPSS from China, India, and Indonesia due to sales at less than fair value). Jurisdiction lies pursuant to 28 U.S.C. § 1581(c) (2000) and 19 U.S.C. § 1516a (a)(2)(B)(i). For the reasons that follow, the

court denies plaintiff's motion.


BACKGROUND

Navneet is an exporter of CLPSS from India.  Compl. ¶ 3.

The subject CLPSS

> are used primarily for taking notes and
> typically sold as school supplies.  CLPSS
> encompass three main products: hole-punched
> filler paper, spiral-bound or wireless
> notebooks (with or without pockets and/or
> dividers), and composition books.  Typically,
> the paper is lined with blue and/or red ink,
> wide ruled or college ruled, and white in
> color.  The color of notebook and composition
> book covers varies from plain to those that
> display fashion graphics.

Final Determination at 3 (footnotes omitted).

On September 9, 2005, the Association[1] filed petitions with

both the United States Department of Commerce ("Commerce") and

the ITC.  Final Determination at 3.  Following its

investigations, Commerce determined that imports into the United

States of CLPSS from India were being sold in the United States

at less than fair value ("LTFV" or "dumped") and also found that

imports were subsidized by the government of India.  *See* Certain

Lined Paper Products from India, 71 Fed. Reg. 45,012 (Dep't of

Commerce Aug. 8, 2006) (notice of final determination of sales at

---

[1]     The Association is comprised of MeadWestvaco
Corporation, Norcom, Inc., and Top Flight, Inc.  Final
Determination at 3.

less than fair value and negative determination of critical

circumstances); Certain Lined Paper Products from India, 71 Fed.

Reg. 45,034 (Dep't of Commerce Aug. 8, 2006) (notice of final

affirmative countervailing duty determination and final negative

critical circumstances determination).

For its part, the ITC instituted a material injury

investigation for the period from July 1, 2004 through June 30,

2005 for LTFV sales, (71 Fed. Reg. 45,012), and for the period

from April 1, 2004 through March 31, 2005 for subsidization (71

Fed. Reg. 45,034).  At the conclusion of this investigation the

Commissioners determined that "an industry in the United States

is materially injured by reason of subject imports of CLPSS from

India and Indonesia that are found to be subsidized, and by

reason of subject imports of CLPSS from China, India, and

Indonesia that are found to be sold in the United States at

LTFV."  Final Determination at 49.


STANDARD OF REVIEW

When reviewing an agency's final determination, the court

will hold unlawful agency determinations, findings, or

conclusions that are "unsupported by substantial evidence on the

record or otherwise not in accordance with law . . . ."  19

U.S.C. § 1516a(b)(1)(B)(i).  "As long as the agency's methodology

and procedures are reasonable means of effectuating the statutory

purpose, and there is substantial evidence in the record supporting the agency's conclusions, the court will not impose its own views as to the sufficiency of the agency's investigation or question the agency's methodology." *Ceramica Regiomontana, S.A. v. United States*, 10 CIT 399, 404-5, 636 F. Supp. 961, 966 (1986), *aff'd*, 810 F.2d 1137 (Fed. Cir. 1987) (citations omitted).

## DISCUSSION

I.   Legal Framework: The ITC's Negligibility Determination

Under the unfair trade laws, Commerce determines whether foreign imports into the United States are either being dumped or subsidized (or both).  It is for the ITC to determine whether these dumped or subsidized imports are causing material injury to a domestic industry in the United States.  *See* 19 U.S.C. §§ 1673(1) & (2), 1671(a)(1) & (2).  If the Commission determines that imports from a particular country are negligible, however, it terminates its investigation without reaching the injury question.  *See* 19 U.S.C. §§ 1673b(a)(1) (preliminary dumping determination), 1673d(b)(1) (final dumping determination), 1671b(a)(1) (preliminary subsidization determination), 1671d(b)(1) (final subsidization determination).  It is plaintiff's claim that this is what should have happened here.

Negligibility is addressed in 19 U.S.C. § 1677(24)(A), which

provides that "imports from a country of merchandise corresponding to a domestic like product identified by the Commission are 'negligible' if such imports account for less than 3 percent of the volume of all such merchandise imported into the United States" during a defined twelve-month period[2] in an antidumping or countervailing duty investigation.  19 U.S.C. § 1677(24)(A)(i).  Importantly, in countervailing duty investigations involving merchandise from "developing countries," such as India, the imports will be found to be negligible if they account for less than four percent of the volume of all such merchandise imported into the United States.[3]  19 U.S.C. § 1677(24)(B).

In computing import volumes for purposes of determining whether imports are negligible, "the Commission may make reasonable estimates on the basis of available statistics."  19 U.S.C. § 1677(24)(C); *see also* Uruguay Round Agreements Act

---

[2]     Pursuant to the statute, merchandise is measured as it was imported in the year prior to the filing of the petition (or the initiation of the investigation if initiated by the administering authority).  19 U.S.C. § 1677(24)(A)(i).  To make its negligibility finding with respect to India, the ITC measured the volume of Indian imports into the United States between September 2004 through August 2005.  Final Determination at 16-17.

[3]     A "developing country" is "a country designated as a developing country by the [United States] Trade Representative." 19 U.S.C. § 1677(36)(A).  The United States Trade Representative has designated India as a developing country.  *See* 15 C.F.R. § 2013.1 (2005).

Statement of Administrative Action, accompanying H.R. Rep. No.
103-316 656 835 (1994), reprinted in 1994 U.S.C.C.A.N. 3773, 4188
(recognizing that the "Commission may not have access to either
complete questionnaire data or official import statistics
conforming exactly to the Commission's like product(s)
designations").

II.  The ITC's Negligibility Determination With Respect to
     Imports of CLPSS from India

     A.   The ITC's Use of a Quantity-Based Measure of Volume

     In this investigation, the ITC used a quantity-based measure
to determine the volume of Indian CLPSS imports for purposes of
determining negligibility.  Specifically, the ITC measured volume
by "units"[4] or pieces, rather than using a value-based measure of
volume, i.e., dollar value of imports.  Final Determination at 19
n. 144.  In doing so, the ITC explained that it typically uses
quantity-based measures "because value-based measures can be
skewed by changes of product mix and the fact that, for subject
imports, the unit values are of merchandise sold at LTFV."  *Id*.
In other words, using a value-based measure could be distortive

_____

     [4]     A unit refers to "an individual product unit, such as a
notebook or a package of filler paper."  Pl.'s Mem. 10 ("A 'unit'
is not an equilibrating unit of measure; rather it reflects the
absence of uniformity or commonality of measurement.") (citation
omitted); Final Determination at 16 n. 123 (noting a unit is
known as an "each" in industry parlance).

because of differences in the value of similar merchandise.  For

example, using a value-based measure, if some nations exported a

small number of high value items to the United States, and

others, such as the Indian exporters, sent a large number of low

cost items to the United States, the lower cost Indian

merchandise would make up a small percentage of the total

imports.  As a result, the value measurement would fail to

accurately measure the high percentage volume (in terms of page

count) of the lower cost merchandise that was being imported into

the United States.  A further distortion would occur when

merchandise is being sold at LTFV, because that merchandise would

necessarily represent an artificially lower percentage of all

CLPSS, if measured by import value.  Because of the potential for

distortion when using value-based measures, quantity-based

measurement is the ITC's standard practice, as both plaintiff and

defendant acknowledge.  *See* ITC's Opp'n 2;   Tr. Conf. Oral

Argument (Jan. 4, 2008) at 4.

     The ITC states that it departs from its usual practice only

where "there are such great variations among the products

involved that reliance on a quantity-based measure of volume

would be fundamentally distortive."  ITC's Opp'n 2.  In its Final

Determination, the Commission stated:

          Although the Commission has relied
          principally on value-based measurements in
          rare instances, those investigations involved

> variations in value among articles within the
> scope and/or domestic like product that were
> much larger than those present here.  In
> those instances, measuring volume by units
> was particularly problematic, because value
> variations for different articles could
> differ by factors of as much as 100.

Final Determination at 19 n. 144.  Thus, Commerce has relied heavily on price variation among the imported articles of merchandise as the determining factor when abandoning its usual practice.  Put another way, in those cases where it has used value-based measures, there has been a great variety of products, and the value of the merchandise had variations of "factors of as much as 100." Final Determination at 19 n. 144 (citing, *inter alia,* Ball Bearings from China, Inv. No. 731-TA-989 (Final), USITC Pub. 3593 at 11 (Apr. 2003); Outboard Engines from Japan, Inv. No. 731-TA-1069 (Final), USITC Pub. 3752 at 24-27 & n. 175 (Feb. 2005)).

Plaintiff, however, insists that it fits within the exceptions made in previous ITC investigations.  For Navneet, the sheer variety of in-scope[5] products makes its case.

---

[5]     Merchandise that is within the scope of an antidumping review conducted by Commerce is referred to as "in-scope merchandise;"  merchandise that is not within the scope of the antidumping review is termed out-of-scope merchandise. *See SKF USA Inc. v. Ina Walzlager Schaeffler KG*, 180 F. 3d 1370, 1373 (Fed. Cir. 1999); Antidumping Manual Ch. 1 at 13 (Jan. 22, 1998) (available at http://www.ia.ita.doc.gov) ("The [Department of Commerce] also determines the scope of an investigation.  The scope of an investigation may also be referred to as the class or

(continued...)

> At the hearing, the Commission was presented
> with samples and testimony by counsel for
> Indonesian and Indian respondents of 150
> sheet filler paper packs, 500 sheet filler
> paper packs, 70 page one subject spiral
> notebooks, and 250 sheet five subject
> notebooks, 100 sheet composition books and
> 160 sheet composition books as well as an 800
> page composition book.  Obviously, this was
> but a small demonstration of the variety of
> types and dimensions of products included
> with the scope of the investigations.

Pl.'s Mem. 10-11.  Navneet also argues that its merchandise showed a variation in price that necessitated a value-based measurement.

> Indeed, filler paper alone ranges from 30-
> count to 500-count, which is a substantial
> difference in weight.  In addition, Public
> [sic] testimony at the Hearing, which
> included demonstrations and submissions of
> samples to the Secretary of the Commission,
> indicates that price is associated with the
> cost of the paper, which is the
> overwhelmingly most significant raw material
> by weight.  Therefore, it is reasonable to
> infer that significant differences in unit
> value indeed exist . . . .

Pl.'s Mem. 20.

In its Final Determination, the ITC stated that it would employ its normal methodology: "Consistent with our customary practice, we have relied on quantity-based measures of volume in this investigation."  Final Determination at 19 n. 144.  The ITC

---

[5](...continued)
kind of merchandise under investigation or the merchandise subject to the investigation.  A single investigation involves a class or kind of merchandise.")

contrasted this case with other cases where there was a "demonstrably wide variation among products" in volume or price. *See* ITC's Opp'n 12.  The ITC states:

> For example, in <u>Ball Bearings from China</u>, the Commission noted that there was a "vast and disparate grouping of items differing in size, configuration, application, and precision," and that "it would present a distorted picture of the market to consider a commodity bearing costing less than one dollar as equivalent to a precision bearing costing hundreds or even thousands of dollars."  In <u>Outboard Engines from Japan</u>, the Commission explained that it relied on value data to assess the volume of subject imports "given the wide spectrum of engine sizes covered by the investigation and the wide variation in the unit value of engines of different sizes."  It explained that the manufacturer's suggested retail prices for outboard engines range from under $1,000 to about $20,000.

ITC's Opp'n 12 (citations omitted).

The court agrees with the ITC.  In contrast to the cases where the ITC has used value-based measurements, Navneet has not shown that its products vary so widely in either variety or price so as to create a substantial distortion.  While the scope used by Commerce in its investigation contained a variety of products, the Indian respondents' actual sales were concentrated in relatively few products: (1) 70 count single subject notebooks; (2) 150 count filler paper; and (3) 100 count composition books. CLPSS from China, India, and Indonesia, Staff Report to the Commission on Inv. Nos. 701-TA-442-443 and 731-TA-1095-1097

(Final) (Aug. 15, 2006)("Staff Report") at Tables V-1, V-2, and V-4.  Other arguably in-scope items made up a relatively small amount of the volume of merchandise exported to the United States.  *Id*. at Tables V-3 and V-6.  Thus, with respect to what was actually imported, plaintiff has not shown a particularly wide variety of product.

Navneet also fails to show variety in terms of price.  An examination of the record evidence reveals that, while there was some variation in price, it was within a relatively tight range.[6] That is, the data on pricing products showed little difference in price when adjusted for the product differences, i.e., size or page-count.  *See* Staff Report at Tables V-1, V-3 & V-6.

---

[6]     The ITC collected data on six pricing products: a 70-count single-subject notebook, a 150-count pack of filler paper, a 180-count five-subject notebook, a 100-count marbled composition book, an out-of-scope 50-count legal pad, and an 80-count "fashion" notebook (i.e., one with licensed artwork or other unusual cover details, such as beadwork, textiles, etc.).  Across the five in-scope products, the lowest price was [[     ]] for the [[
]].  The highest prices were [[
                                    ]] and [[

]].  Among Indian merchandise, there was even less variation: the lowest price was [[
                          ]] and the highest price was [[
  ]].

Ass'n.'s Resp. 6-7 (citations omitted).

In addition, a value based measure would not give a true picture of the amount of Indian paper that was entering the United States.  The record indicates that "fashion" notebooks, which typically have artwork and special covers, have a much greater value than a regular notebook having a similar page count. *See* Staff Report at Tables IV-5, V-1, V-2.  Therefore, in a value based comparison, this difference in value among products with similar paper count would overstate the proportion of "fashion" notebooks while understating the proportion of plain notebooks, even though the number of units imported might be the same. *See* Final Determination at 19 n. 144 ("We typically rely on quantity-based measures of volume because value-based measures can be skewed by changes of product mix.").  As previously noted, India exports to the United States relatively few higher priced "fashion" notebooks, and thus a value-based measure would tend to understate the amount of paper it introduces into the United States market.  *See* Staff Report at Table V-6; Ass'n.'s Resp. 10.[7]

---

[7]     Contrary to Navneet's argument that the Commission precluded it from showing evidence of variability among CLPSS products because it failed to request or require "further 'evidence demonstrating how much volume variation among imports exists,'"(Pl.'s Mem. 20), the record shows that the ITC invited the parties to address this question at two separate points in the administrative process.  *See* CLPSS, Inv. Nos. 701-TA-442-443 and 731-TA-1095-1097 (Preliminary), USITC 3811 (Oct. 2005) at 25 n. 110 (Preliminary Determination); Tr. Final Phase Hearing
(continued...)

The Commission is charged with the responsibility to calculate import volumes for purposes of negligibility by making "reasonable estimates on the basis of available statistics."  19 U.S.C. § 1677(24)(C).  Based on the foregoing, it cannot be said that the Commission's decision to use volume- rather than value-based measures was unreasonable or that plaintiff has demonstrated that valuation based on price would yield a more accurate result than the ITC's volume methodology.  *See, e.g.*, *Koyo Seiko Co., Ltd. v. United States,* 31 CIT __, __, 516 F. Supp. 2d 1323, 1341 (2007) ("NTN did not satisfy its burden of showing that its allocation method did not cause inaccuracies or distortions."); *Shakeproof Assembly Components Div. of Ill. Tool Works, Inc. v. United States*, 30 CIT __, __, Slip Op. 06-129 at 15-16 (2006) (not reported in the Federal Supplement) ("Defendant-Intervenor offers no compelling reason for why such a constructed average would result in a more accurate valuation here than simply using information taken directly from the period of review.") (footnote omitted).  The court sustains the Commission's finding.

---

[7](...continued)
("Hearing Transcript") (July 25, 2006) at 189-190.  Navneet had ample opportunity to present its case.

B.    The ITC's Use of a Conversion Factor

In conducting its investigation, the ITC found that one type of imported product did not easily conform to the volume-based (i.e., unit-based) methodology.[8]  Filler paper is imported under a Harmonized Tariff Schedule of the United States ("HTSUS") subheading that measures imports by weight, not units.  Thus, the Commission converted the data from HTSUS statistical reporting number 4811.90.9090[9] from kilograms to units using a conversion factor, i.e., weight to pages.[10]

Navneet challenges the ITC's use of the conversion factor:

---

[8]    As previously noted, plaintiff's imports fell generally into three categories: hole-punched filler paper; spiral-bound or wireless notebooks; and composition books.  *See* Final Determination at 3.  As a result of its investigation, the ITC found that most covered merchandise was imported under classification subheadings 4811.90.9090 and 4820.10.2050.  Final Determination at 18.  Subheading 4820.10.2050, covering notebooks and composition books, recorded entries on a unit basis.  Entries made under the tariff provision for filler paper, (subheading 4811.90.9090), however, recorded entries on a kilogram basis.

[9]    The reporting number includes: "Paper, paperboard, cellulose wadding and webs of cellulose fibers, coated, impregnated, covered, surface-colored, surface-decorated or printed, in rolls or rectangular (including square sheets, of any size, other than goods of the kind described in heading 4803, 4809, or 4810)".  Staff Report at I-II, Table I-3; Navneet's Post-Hearing Br. Ex. 4a.

[10]    Of the products within the scope of these investigations, the merchandise reported under HTSUS 4811.90.9090 includes filler packages, the most common being the 150-count packages, and loose paper, for which volume is recorded in kilograms.  ITC's Opp'n 18-19.  Therefore, the conversion factor was only applied to merchandise reported under HTSUS 4811.90.9090.  *Id*.

> There is no reasonable way to convert pieces
> to kilograms or kilograms to pieces because
> there is no information on this record other
> than speculation that would provide a basis
> to determine the exact nature of the [CLPSS]
> or their material components (and thus their
> weight) included in a "unit" or piece in the
> official statistics.

Pl.'s Mem. 10.

The ITC converted the kilograms of paper under 4811.90.9090 to a unit basis, using a conversion factor based on the weight of 150-count filler paper, as provided by the Association in the petition.[11]  Final Determination at 18 n. 139, IV-1 n. 6.  No other party submitted a potential conversion factor during the investigation.  *See* ITC's Opp'n 19; Pl.'s Reply Br. 9; Ass'n.'s Resp. 14-15.

Before the court, Navneet goes beyond questioning the use of a conversion factor by insisting that a different conversion factor be used.  Pl.'s Mem. 12-14, Exs. 1, 2.  Specifically, Navneet argues that there is an "industry standard" formula for

---

[11]    The ITC stated:

We note that quantity data for statistical reporting number 4811.90.9000 was converted from kilograms using a conversion factor suggested by Petitioner, reflecting the per-unit weight of what it identifies as the most common filler paper package (150-count at 0.491262 kg). Importers' responses to the Commission's questionnaire confirm that the most common filler paper package contains 150 sheets of paper.

Final Determination at 18 n. 139 (citations omitted).

converting kilograms into units of paper.  Pl.'s Mem. 12.

Plaintiff argues:

> Since petitioners' conversion ratio does not
> correspond to the industry standard for
> school filler paper – or the Commission's
> definition derived therefrom, and since
> petitioners' conversion appears to inflate
> the quantity they used for the conversion
> even for the product they describe, the Court
> should strike their conversion ratio and
> remand on this basis alone.

Pl.'s Mem. 14.

Plaintiff's claims are unavailing.  By translating the

weight of the filler packs and loose paper into "units" of the

"most common filler paper package (150-count)," the Commission

made a "reasonable estimate on the basis of available

statistics."  19 U.S.C. § 1677(24)(C).  The conversion factor was

not complex, but merely translated the weight of paper into units

in order to get a common basis for measurement.  Moreover,

Navneet's claim that "[t]he extensive choice and variety of in-

scope retail products in these categories [HTSUS 4820.10.2050 and

HTSUS 4811.90.9090] renders 'conversion' of each 'unit' into

kilograms . . . a highly speculative exercise[,]"[12] is

unconvincing. Pl.'s Mem. 11.  The conversion factor was not

applied to a variety of merchandise but only to filler paper.

---

[12]     Navneet inverts the phrasing here, but the court
assumes that it challenges the conversion of *kilograms* into *units*
as that was the conversion done by the ITC.

ITC's Opp'n 19. ("[O]nly filler paper packs and loose paper were subject to the kilograms-to-units conversion, [such that] application of the conversion factor would not have resulted in any distortion at all.")

There is nothing inherently unreasonable about determining the weight of 150 pages of filler paper and then converting that weight into units. While it is not impossible that the ITC improperly determined the weight-to-page count ratio, plaintiff failed to place any evidence on the record in the administrative proceeding indicating that the ITC's chosen conversion factor yielded an inaccurate result.

Moreover, during the investigation Navneet failed to present to the ITC any evidence regarding an alternative conversion factor. That is, Navneet never suggested to the ITC its own amount for the number of pages of filler paper per kilogram or that an industry standard existed. Navneet's sole reference to the conversion factor made in the administrative proceedings was in Navneet's post-hearing brief where it stated, "there is simply no reasonable way to convert . . . kilograms to pieces." Navneet's Post-Hearing Br. 4. This argument is, of course, undercut by plaintiff's claim before the court that there is an industry standard.

As to plaintiff's insistence that there is an industry standard that the ITC should have used as a conversion factor,

that matter cannot be reviewed by this court.  Navneet had its
opportunity to introduce its evidence of an industry standard
during the proceedings before the ITC and failed to do so.  The
court's review of the Commission's determination must be based
solely on the agency record.  *See Titanium Metals Corp. v. United
States*, 25 CIT 648, 663 n. 12, 155 F. Supp. 2d 750, 765 n. 12
(2001) (refusing to review two exhibits which were not part of
administrative record);  *Kerr-McGee Chem. Corp. v. United States*,
21 CIT 1179, 1180-82, 985 F. Supp. 1162, 1163-64 (1997) (holding
that evidence on arguments not presented to or obtained by
Department of Commerce during course of administrative review
were not properly part of the record for review).  Plaintiff has
therefore waived this argument.  *Holmes Prods. Corp. v. United
States*, 16 CIT 1101, 1103 (1992) (finding plaintiff's arguments
waived for failing to raise them before the agency).  Therefore,
the court finds the ITC's use of a conversion factor to be
reasonable and Navneet's arguments and evidence regarding the
accuracy of the conversion factor to be outside of the record and
thus not reviewable by this court.


    C.    The ITC's Choice of Harmonized Tariff Schedule of the
           United States Statistical Reporting Categories for
           Determining Volume

In order to measure the volume of CLPSS imports during the
September 2004 to August 2005 period, the ITC chose the HTSUS

statistical reporting numbers that were actually used to enter the merchandise by importers.  Navneet contests this choice.

In the investigation, the ITC found that there were problems with the data from questionnaire responses and with official import statistics.  The ITC stated that "[t]he questionnaire responses yielded a low percentage of import coverage, as the data submitted by responding importers for 2005 [was] equivalent to 39 percent of the value of total U.S. imports of CLPSS." Final Determination at 17 (footnote omitted).  There is no dispute among the parties that there were problems with the questionnaire responses.  Pl.'s Mem. 9-10; *see also* Def.'s Mem. 6.

As a result, the ITC concluded, "In light of the deficiencies in the questionnaire data, we rely on the official import statistics."  Final Determination at 17.  Having concluded that it would rely on official statistics, the ITC was required to decide "under which HTSUS statistical reporting numbers we should measure subject merchandise."  Final Determination at 17. The ITC determined that, rather than rely on all of the HTSUS subheadings chosen by Commerce in its scope determination, it would use the two subheadings under which a large majority of merchandise was entered, i.e., HTSUS 4820.10.2050 and 4811.90.9000.

Specifically, the ITC stated

The record indicates that all but four of the 32 responding firms reported importing CLPSS under statistical reporting number 4820.10.2050 during the period of investigation. Seven firms reported importing CLPSS under number 4811.90.9090,[13] while six firms reported importing CLPSS under reporting number 4820.10.2020.[14] Because statistical reporting number 4820.10.2020, covering "memorandum pads, letter pads and similar articles," contains predominately non-subject note pads and letter pads and the majority of responding U.S. importers identified statistical reporting numbers 4811.90.9000 and 4820.10.2050 more frequently, we find on balance that the official import statistics provided under those two statistical reporting numbers (4820.10.2050 and 4811.90.9000) are a more comprehensive and accurate measure of import volume.

*Id.* at 18 (footnote omitted). In other words, while additional

---

[13] "Effective July 1, 2005, statistical reporting number 4811.90.9000 was divided into two numbers. The appropriate statistical reporting number for filler paper after that date is 4811.90.9090." Final Determination at 17 n. 133 (citation omitted). The two numbers are referred to interchangeably in the record and in this opinion.

[14] One U.S. importer reported importing subject CLPSS under HTSUS number 4810.2010. We also acknowledge that five or fewer firms responding to our importers' questionnaire indicated that they import subject CLPSS under HTSUS statistical reporting numbers other than the [sic] those identified by Commerce's scope. As the majority of responding importers do not use statistical reporting number 4810.10.2010 as well as other statistical reporting numbers not identified in Commerce's scope language, we conclude that they contain mostly non-subject merchandise and do not provide an accurate means of assessing subject import volume.

Final Determination at 18 n. 138 (citations omitted).

HTSUS subheadings were identified by Commerce as within the scope of its investigation, HTSUS numbers 4820.10.2050 and 4811.90.9000 were used by most importers to classify the subject merchandise upon actual importation during the period of investigation.

The Indian respondents argued, as does plaintiff here, that the ITC should utilize all five statistical reporting numbers (or some combination thereof) used by Commerce in the scope of its investigation to analyze negligibility.[15]  It can be presumed that the inclusion of these other subheadings would result in a ratio favoring plaintiff's negligibility claim.

The ITC states that it "does not dispute that some subject merchandise might have been entered (whether through correct or incorrect tariff classification by importers) under the additional tariff subheading[s] listed in Commerce's scope."

---

[15]    The five statistical reporting numbers identified by Commerce were:  4810.22.5044 (hole-punched looseleaf paper and paper coated with clay or other inorganic materials), 4811.90.9090 (filler paper and loose paper), 4820.10.2010 (diaries and address books), 4820.10.2020 (memorandum pads, letter pads and similar articles), 4820.10.2050 (notebooks). *See* Final Determination at 17 (footnotes omitted); Navneet's Post-Hearing Br. Ex. 4a.

Indian Respondents proposed four additional HTSUS statistical reporting numbers for inclusion in the ITC's analysis: 4820.10.4000 (registers and account books, of paper or paperboard), 4802.62.6040 (products containing unlined paper), 4820.30.0020 (looseleaf binders, (other than book covers), of paper or paperboard), and 4820.30.0040 (binders (other than book covers), except looseleaf, folders and file covers, of paper or paperboard).  *See* Final Determination at 17-18 (footnotes omitted); Navneet's Post-Hearing Br. Ex. 4a.

ITC's Opp'n 25 (footnote omitted).

> The fact that some within-scope products
> might occasionally be entered under a tariff
> subheading does not justify including all
> imports under that subheading in the
> computation of the volume of subject imports,
> where the evidence shows that the tariff
> subheading applies predominantly to out-of-
> scope products.  Including all imports under
> such tariff category would have been
> inconsistent with the Commission's mandate to
> make "reasonable estimates on the basis of
> the available statistics."

*Id.* (footnote omitted).

     As the Commission notes, it is charged with making

"reasonable estimates on the basis of the available statistics."

19 U.S.C. § 1677(24)(C).  In addition, the statute indicates that

the Commissioners are to make an independent determination as to

what imports are to be considered.[16] *See* 19 U.S.C. § 1677(24)(A)

------

[16]     Navneet also argued that the ITC erred because "the
Commission normally accepts the tariff numbers identified by
Commerce as setting the boundaries of the negligibility data."
Pl.'s Mem. 21.  The ITC, however, need not apply each tariff
number listed in Commerce's scope determination:

> The Commission certainly begins each domestic
> like product analysis with Commerce's
> description of the scope of the
> investigation.  As in the preliminary Views
> of these investigations, the Commission does
> not, as a matter of practice, apply each
> tariff number included in that description to
> measure subject import volume.  Rather, the
> Commission makes "reasonable estimates on the
> basis of available statistics" of pertinent
> import levels for purposes of deciding
> negligibility.  Moreover, by Commerce's

                                              (continued...)

("[I]mports from a country of merchandise *corresponding to a domestic like product identified by the Commission* are 'negligible' if such imports account for less than 3 percent of the volume of all such merchandise imported into the United States in the most recent 12-month period for which data are available . . . .")(emphasis added).

Moreover, the inclusion of some within-scope merchandise under a tariff subheading that predominantly applies to out-of-scope products does not undermine the reasonableness of the ITC's determination not to use those subheadings in its analysis. The ITC determined that, on balance, a more accurate estimate could be reached by excluding tariff subheadings that included mostly out-of-scope and only some in-scope products. The court cannot find that this was unreasonable. *See Nippon Steel Corp. v. United States,* 458 F. 3d 1345, 1352 (Fed. Cir. 2006) ("[The court] must affirm a Commission determination if it is reasonable and supported by the record as a whole, even if some evidence detracts from the Commission's conclusion.")(citations and

---

[16](...continued)
   admission, the six HTSUS statistical reporting numbers are merely reflective of the typical headings under which subject merchandise is imported and are not dispositive.

Final Determination at 18-19 n. 140 (citations omitted). *See also* Wooden Bedroom Furniture from China, Inv. No. 731-TA-1058 (Final), USITC Pub. 3743 at 18-20, IV-1 n.4 (Dec. 2004).

quotation omitted).

D.    The ITC's Decision Not to Make a Downward Adjustment to
      Official Import Statistics in Measuring the Volume of
      Indian Imports

Finally, Navneet takes issue with the ITC's denial of its

request that the official import statistics be adjusted downward

"to remove the volume of non-subject merchandise [exported from

India] from the total volume reported" under HTSUS subheadings

4820.10.2050 and 4811.90.9000. Final Determination at 18

(footnote omitted).  According to plaintiff, the adjustment would

provide a more accurate result.

Plaintiff's "proposed reductions were based on an estimate

in an email from an executive at 'American Scholar,' a U.S.

producer of CLPSS that also has production operations in India."

ITC's Opp'n 26 (citing Hearing Transcript at 234).[17]  The email

stated that, based on the writer's experience with the subject

merchandise, there was a percentage of in-scope products within

the chosen tariff numbers that could be estimated fairly and

accurately.[18]  Navneet insists that the email provides the basis

---

[17]    *See also* [[
          ]] ("Aug. 25 E-mail").

[18]    The email read as follows:

        [[

                                                        (continued...)

for determining the amount of out of scope merchandise in each HTSUS subheading.  The email thus constituted a proposal by Navneet to reduce the import data under HTSUS statistical numbers 4820.10.2050 and 4811.90.9000 by the writer's estimated percentages of subject and non-subject merchandise.

The Commission received the proposal to reduce the volume under the two selected HTSUS reporting numbers on the day the record closed.  Final Determination at 18-19.[19]  According to the ITC, because of the record closing, it was impossible for the ITC staff to verify the accuracy of the proposed reductions, which in any event were submitted without an explanation of the methodology employed.  *Id*.  Moreover, the ITC stated that "subject imports from India and Indonesia still are not

---

[18](...continued)

]]

Aug. 25 E-mail.  According to this proposal, Navneet sought to reduce the import data under HTSUS statistical number 4820.10.2050 by [[        ]] and under HTSUS statistical number 4811.90.9090 by [[        ]]. *See Id*.

[19]    The proposal was sent via email at 4:04 p.m. on Friday, August 25, 2006, the day the record closed.  ITC's Opp'n 26; Aug. 25 E-mail.

negligible when the HTSUS statistical reporting numbers are reduced by the highest, middle, and lowest proposed percentages." Final Determination at 19 n. 142 (citations omitted).

Plaintiff objects that the Commission unreasonably refused to "take into account record evidence clearly indicating that the HTSUS numbers under consideration were not composed exclusively of subject merchandise." Pl.'s Mem. 23-24 (footnote omitted). Plaintiff further claims that the Commission itself "often" puts new information on the record at the close of an investigation. Pl.'s Mem. 25. In support of its position that the other parties would not be prejudiced "even when critical information is placed on the record and disclosed to parties on the last day that the record was open," plaintiff cites to *Sichuan Changhong Elec. Co., Ltd. v. United States*, 30 CIT ___, 466 F. Supp. 2d 1323 (2006) ("*Sichuan*"), stating that the case upheld the ITC's decision to put information on the record on the day it closed because respondents had the opportunity to provide final comments a few days later. Pl.'s Mem. 25.

*Sichuan* is distinguishable from this case. As the Commission points out, in *Sichuan*:

> the computations that were placed on the record shortly before its closing (the one-page digest of the domestic industry's financial information) were based on data that had been submitted earlier; and there was no suggestion that the data had been submitted without any explanation, or that

the Commission staff had been unable to
verify the accuracy of the data.  In short,
the circumstances were quite different from
those surrounding the American Scholar email
in the CLPSS investigations.

ITC's Opp'n 29 (citations omitted).

The ITC has surely received new evidence late in other proceedings, but in this case it reasonably excluded the submission.  *See Gen. Motors Corp. v. United States*, 17 CIT 697, 702-03, 827 F. Supp. 774, 780-781 (1993) ("Given the lateness of the plaintiffs' allegations, ITC's decision not to conduct a supplemental investigation was reasonable.").  First, Navneet submitted its proposed reductions without any explanation or description of the methodology by which they were reached.  As a result, in order to render the methodology useful, the Commission would have been required to reopen the record to verify the accuracy of the proposed reductions and provide the other parties the opportunity to submit any analysis or new factual information in response.  The antidumping statute requires time for public comment:

Information that is submitted on a timely
basis to the administering authority or the
Commission during the course of a proceeding
under this subtitle shall be subject to
comment by other parties to the proceeding
within such reasonable time as the
administering authority or the Commission
shall provide.  The administering authority
and the Commission, before making a final
determination . . . shall cease collecting
information and shall provide the parties

> with a final opportunity to comment on the
> information obtained by the administering
> authority or the Commission (as the case may
> be) upon which the parties have not
> previously had an opportunity to comment.
> Comments containing new factual information
> shall be disregarded.

19 U.S.C. § 1677m(g).  Had the ITC accepted the proposal without

offering time for the other parties to comment, it would have

contravened the statute.

Most tellingly, however, the subject imports would not be

negligible even if the proposed percentages were used to reduce

the reporting numbers.  Final Determination at 19 n. 142.

Therefore, the Commission's refusal to adjust the import data per

Navneet's proposal was reasonable, supported by substantial

evidence, and otherwise in accordance with law.

CONCLUSION

For the foregoing reasons, the court sustains the findings of the International Trade Commission. Plaintiff's motion for judgment upon the agency record is denied. Judgment shall be entered accordingly.


                                    __/s/__Richard K. Eaton_____
                                         Richard K. Eaton

Dated:     February 26, 2008
           New York, New York